# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE EIGHT THOUSAND, FIVE HUNDRED EIGHT DOLLARS AND SIXTY-THREE CENTS ($8,508.63) FROM PNC BANK ACCOUNT x1775 et al. | MISC. ACTION<br><br>No. 17-136 |

## **MEMORANDUM**

PRATTER, J.                                                                                                                                             JULY 13, 2018

Is a claim is "filed" with an agency when it arrives at the agency's mailroom, or when it lands in a particular official's hands? The resolution of that question determines the outcome of this dispute.

After seizing funds from Peter Goodchild, the FBI's mailroom received a claim from Mr. Goodchild on May 4, but the specific *agent* did not physically possess the claim until May 5. The Government requested an extension to submit its responsive complaint 90 days after May 5, on the last day of what it perceived was its statutory time limit. Mr. Goodchild argues that the Government's clock actually started on May 4, and that the Government's request for an extension was one day late. Such "how do you count?" issues have bedeviled lawyers for years.

Bound by the statute and confined by reasonable regulatory text, the Court concludes that a claim is "filed" when it arrives at the agency. Therefore, Mr. Goodchild's claim was filed on May 4, and the Government's responsive complaint, filed one day too tardy, is time-barred. Further, given the notable number of federal courts to indulge the Government by granting equitable tolling under similar circumstances, the Court declines to extend the indulgences yet

1

again to find equitable tolling here. Time and time again, courts have granted equitable tolling after coming to the same "counting-the-days" conclusion as this Court, so the Government cannot continue to plead ignorance and disregard, to its own advantage, the plain meaning of the regulation.

## BACKGROUND

On February 8, 2017, the FBI seized funds from Mr. Goodchild's bank accounts. On May 2, 2017, Mr. Goodchild mailed a claim to retrieve the seized funds. The claim arrived at the FBI's mailroom on May 4, and arrived in the forfeiture unit on May 5. This one-day lag is crucial to this case—the timeliness of the Government's request for an extension (and thus its ability to file a complaint) turns on whether the claim was "filed" on May 4 or May 5.

"Not later than 90 days after a claim has been filed, the Government [must] file a complaint for forfeiture." 18 U.S.C. § 983(a)(3)(A). The Government filed its request for an extension on August 3, 2017. This was 90 days after May 5, but 91 days after May 4. Mr. Goodchild requested reconsideration of the grant of the extension, and moved to dismiss the complaint for violating the 90-day window. The Government maintains that its request, and by extension its complaint, was timely.

## DISCUSSION

### I. Statutory Interpretation

Before delving into the competing views advanced by the parties, the Court must first turn to the statutory text and the related regulation. The Court begins by discussing the background of the statutory scheme before turning to *Chevron*. Under the *Chevron* rubric, the Court finds that the statute can be reasonably interpreted in two ways. Because of this ambiguity,

the Court will turn to the Code of Federal Regulations (CFR), which reasonably adopts one of the two permissible interpretations.

### A. Statutory Scheme

The statutory scheme governing federal asset forfeiture is the Civil Asset Forfeiture Reform Act (CAFRA), 18 U.S.C. § 983 *et seq.* (2012). CAFRA is a comprehensive scheme that supplemented the patchwork system of laws that previously governed forfeitures, providing more due process to individuals affected by property seizures. Stefan D. Cassella, *The Civil Asset Forfeiture Reform Act of 2000: Expanded Government Forfeiture Authority and Strict Deadlines Imposed on All Parties*, 27 J. LEGIS. 97, 122-25 (2001). CAFRA was enacted as "a reaction to the perception that there was some inequity in imposing strict deadlines and sanctions on property owners contesting civil forfeiture actions, while not imposing similar deadlines and sanctions on the Government. The logic was that if property owners were required to file claims within a fixed period of time and were made to suffer consequences for failing to do so, the Government should face deadlines and suffer consequences as well." *United States v. $229,850.00 in U.S. Currency*, 50 F. Supp. 3d 1171, 1176 (D. Ariz. 2014) (quoting Cassella, *supra*).

When the Government seizes property under CAFRA, a series of deadlines are set. First, the Government must send personal written notice to "interested parties" within 60 days. 18 U.S.C. § 983(a)(1)(A)(i). Second, upon receipt of the notice, a party "may file a claim with the appropriate official after the seizure" to reclaim that property within 35 days. 18 U.S.C. § 983(a)(2)(A). (Neither of these two deadlines are at issue here.) Third, once a claim is filed, the

Government has 90 days to file a complaint for forfeiture. 18 U.S.C. § 983(a)(3)(A). Once the 90-day deadline has elapsed, the Government's ability to seize the funds is forever barred.

CAFRA does not define the term "filed." Administrative guidance, however, defines it as "received by the appropriate official." 28 C.F.R. § 8.2. The phrase "appropriate official" is defined in the regulation as the "office or official identified in the . . . personal written notice." *Id*. The regulatory scheme thus defines "filed" as "received by the office or official identified in the personal written notice." Here, the written notice required claims to be mailed to "the Federal Bureau of Investigation (FBI), Attn: Forfeiture Paralegal Specialist." It further notes that (consistent with the regulatory definition) a "claim is deemed filed on the date received by the agency at the address listed above."

### B. *Chevron* Interpretation

In interpreting statutes, "the judiciary [must] afford an agency discretion to interpret ambiguous provisions of the agency's organic or enabling statute." *Swallows Holding v. Comm'r of Internal Revenue*, 515 F.3d 162, 167 (3d Cir. 2008). The seminal case, *Chevron*, set forth a two-step analysis. *See Chevron U.S.A. v. Nat'l Res. Def. Council*, 467 U.S. 837, 842–43 (1984). First, at *Chevron* step I, the Court must determine if the statute is unambiguous. Second, at *Chevron* step II, the Court must determine if the agency's interpretation is reasonable.

#### 1. *Chevron* Step I

At *Chevron* step I, the Court finds the word "filed" to be ambiguous. "Filed" can have many meanings, from postmarked, to received in the mailroom, to being entered into a physical

4

filing cabinet.[1] Sensing this, neither party argues that the word "filed" is unambiguous, and the Court declines to find it unambiguous.

In the context of CAFRA, courts have diverged on how to interpret the word. Most courts have held that claims are "filed" when received by the mailroom of the relevant agency. *See, e.g.*, *United States v. $229,850.00 in U.S. Currency*, 50 F. Supp. 3d 1171, 1176 (D. Ariz. 2014). In dismissing the Government's argument that a claim is not filed until actually in the agent's hands (the same argument the Government advances here) courts point to the inequity in requiring the claimant to rely on mailroom procedures outside of his or her control. *See id.*; *United States v. Funds from Fifth Third Bank Account*, No. 13-cv-11728, 2013 WL 5914101, at *7 (E.D. Mich. Nov. 4, 2013) (concluding that a claim is filed when received by the seizing agency's mailroom because it preserves equitable limitations on t.he government); *United States v. Funds in the Amount of $314,900.00*, No. 05-cv-3012, 2005 U.S. Dist. LEXIS 49835 (N.D. Ill. Dec. 21, 2005) (same); *United States v. 2014 Mercedes-Benz GL350BLT, VIN: 4JGDF2EE1EA411100*, 162 F. Supp. 3d 1205, 1213 (M.D. Ala. 2016) (same).

Other courts have found that the word filed means physically received by a specific person. *See United States v. One GMC Yukon Denali*, No. 03-cv-6890, 2003 WL 27177023, at *4 (C.D. Cal. Dec. 4, 2003) (claim is filed when it reaches a proper official within the forfeiture division, not the remote mailroom delivery site that merely screens all incoming packages for contamination); *United States v. $7,696.00 in U.S. Currency*, No. 12-cv-116, 2013 WL 1827668, at *4 (N.D. Iowa Apr. 30, 2013) (a claim was filed not when it was received by the agency office in general, but only when it was received by the specific official in question).

---

[1] A cynic might even reference placement in "the round file," *i.e.*, the wastebasket.

Outside of the CAFRA context, courts have diverged on interpreting the word filed. For example, federal tax law requires that a given tax shall "be assessed within 3 years after the return was *filed*." 26 U.S.C.A. § 6501(a) (emphasis added). The Seventh Circuit Court of Appeals found that the date that a document was filed was the date it was *postmarked*. *Hotel Equities Corp. v. Comm'r of Internal Revenue*, 546 F.2d 725, 728 (7th Cir. 1976). The court relied on case law and legislative history to find that "filed" in § 6502 means "mailed" and not (as the regulation defines here) "received." *Id.*; *see also Emmons v. Comm'r of Internal Revenue*, 898 F.2d 50, 51 (5th Cir. 1990) (finding that timely returns are considered filed as of the postmark date). Given the different interpretations of the word, the Court finds the term to be ambiguous.

Likewise, the phrase "appropriate official" in the statute is also ambiguous. From the face of the statute, it is unclear who the appropriate official is. Indeed, that official could vary from office to office or agency to agency. Congress could have specified one central location or office where the claim must be sent, but instead included this ambiguous phrase, allowing the agency to define it with specificity. Therefore, the Court must proceed to *Chevron* step II and look to the regulatory guidance.

### 2. *Chevron Step II*

Chevron step II requires the Court to look to the regulation and determine whether the interpretation advanced by the agency is reasonable. *Swallows Holding*, 515 F.3d at 169. To do so, the Court must first look to the statutory text. The text of CAFRA shows that there are only two possible interpretations of the word "filed," and the regulation picks one of these two interpretations, which the Court is bound to follow.

### a. Filed as Used in the Statute

The word "filed" is used in two relevant sentences in the statute. "A claim . . . may be **filed** [by the claimant] not later than the deadline set forth in a personal notice letter, [and n]ot later than 90 days after a claim has been **filed**, the Government shall file[2] a complaint for forfeiture. . . ." 18 U.S.C. §§ 983(a)(2)(B); (3)(A) (emphasis added). The first use of "filed" defines when the claimant files the claim, and the second defines when the clock begins to run on the Government's ability to file a complaint. Under the canon of consistent usage, the Court reads this word as having one consistent meaning. *United States v. Castleman*, 134 S. Ct. 1405, 1417 (2014) ("[T]he presumption of consistent usage [is] the rule of thumb that a term generally means the same thing each time it is used [and] most commonly applie[s] to terms appearing in the same enactment.") (Scalia, J., concurring); *see also Abbott v. Essex Co.*, 59 U.S. 202, 216 (1855) ("A rule of construction which would give different meanings to the same words, in the same sentence, could only be tolerated where, from the whole context of the [document], it is evident that without such construction the general intent . . . would be frustrated.").

Therefore, "filed" must have the same meaning in both provisions. This means that the time when the claimant files a claim must start the clock running on the Government to file a civil forfeiture action. *Cf. Barrett v. United States*, 432 U.S. 212 (1976) (holding that the Court must interpret the gun control act's separate provisions to have complimentary terms, because otherwise there would be gaps in the coverage of the act). In other words, once the claim has been filed with the agency, the clock on the claimant stops and the clock on the agency begins to run. All parties agree that this must be the case.

---

[2] This use of the word "file" deals with the Government filing a complaint with a court.

The fact that "filed" affects both the claimant and the Government means that there are only three possible interpretations of the word "file." The first is the postmarked date of the claim, the second is when the claim arrives at the agency, and the third is sometime after that, when the claim is actually placed into an actual filing system. However, when reading the statute in context, only the first two are permissible constructions under the statute; the third is not. In the first two constructions, the word "filed" defines an action taken by the claimant to send the claim to the agency, which is required by the statute. The statute uses "filed" as a way of simultaneously leaving the control of the claimant and starting the clock on the Government's statute of limitations. However, the third construction, interpreting filed as "being placed in a filing system," or "being in the hands of a given agent" cannot be a permissible construction of the statute for three reasons.[3]

First, to make sense of this reading, there must be a gap between when a claim is filed by the claimant and when the clock starts to run on the Government. As outlined above, this cannot be so. "A claim . . . may be **filed** [by the claimant] not later than the deadline set forth in a personal notice letter, [and n]ot later than 90 days after a claim has been **filed**, the Government shall file a complaint for forfeiture. . . ." 18 U.S.C. §§ 983(a)(2)(B); (3)(A) (emphasis added). Under the statute, the closing of the 35-day window (when the claimant files the claim) must start the 90-day clock on the Government. But under the Government's proposed reading, although the claimant may comply with the requirements by submitting a claim to the proper office or official, the clock on the Government does not always start. As in this case, although a

---

[3] The Government urges the Court to adopt the view that its 90-day clock does not begin until the claim arrives on the paralegal's desk. Such a reading would mean that the Government's complaint here is timely, but as outlined above, is ultimately incorrect.

claimant may get his claim into the FBI mailroom on the required day, the Government's reading means that its clock does not begin to run until it is internally routed (by whatever means and methods) to the proper person. This "gap in coverage" means that this is not a viable interpretation.

Second, if the Court were to conclude that there is no gap in coverage (that is, the closing of the claimant's clock begins the running of the Government's clock), as the statute compels, such a reading would allow the Government to extend its 90-day window by simply leaving claims to sit in the mailroom until the Government processes them. Not only that, but the Government could cause the claim to lapse by leaving it in the mailroom and refusing to internally route the mail until the claim is no longer timely. Much like a winning quarterback kneeling with the ball while the opponent stands helplessly by, the Government could simply "run out the clock" while the claimant sits helplessly on the sidelines.[4] In this case, for example, if Mr. Goodchild had sent his claim a day later, it would have arrived in the mailroom on time, but it would have arrived at the agent's desk too late—all through circumstances entirely out of Mr. Goodchild's control. In that case, under the Government's interpretation, Mr. Goodchild would have lost his ability to file his claim.

At oral argument, the Government asserted that this concern should not give the Court pause. The Government reasoned that the agency could, on its own, decide to accept a claim that was untimely under these circumstances. Indeed, however, the Court is bound to interpret text, not rely upon altruistic intentions of government employees. The Court cannot simply presume

---

[4] Reportedly, during the 1940s, commentators discussing America's two most popular time-sensitive sports—football and basketball—started talking about "running out the clock." JOSH CHETWYND THE FIELD GUIDE TO SPORTS METAPHORS 197 (2016). Certainly, teams leading a game in either sport could have employed such a strategy well before then, but it seems that is when the phrase took off. Football coaches were observed opting for this tactic more often than their basketball counterparts. *See id*.

that the government employees would have a charitable view of a claim. In any case, such a view is irrelevant to interpreting the text of the statute and regulation.

Finally, although the statute requires the claimant to be the one to file the claim, this reading would mean that the act of filing would be performed by someone other than the claimant. The reading advanced by the Government here would require the Government to perform an action to ensure a claim is "filed." The statute does not contemplate the Government being involved in the filing process at all. *See* 18 U.S.C. § 983(a)(2)(A) ("Any person claiming property seized in a nonjudicial civil forfeiture proceeding under a civil forfeiture statute may file a claim"). The statute requires the claimant to do something to file the claim, but once the claim arrives on the FBI's property, the claimant cannot ensure that it is physically sent to the right official. Therefore, although the statute requires the claimant to "file a claim," the interpretation advanced by the Government means that the claimant can never actually complete that duty. The most the claimant can do is get the claim to the office, and once it is under the control of the Government, the claimant has no ability to influence the situation. Therefore, this interpretation is contradicted by the statute.

In short, the only permissible (and, thus, the only reasonable) construction of the statute is that the word "file" means leaving possession of the claimant. However, it is unclear from the statute (1) whether this means the date of mailing or date of agency receipt, and (2) who the "appropriate official" is that the claimant must send the claim to. Therefore, the Court must turn to the regulation for further guidance.

### b. CFR Definition of File

The Code of Federal Regulations (CFR) defines "filed" as when a claim is "actually received by the appropriate official identified in the personal written notice." 28 C.F.R. § 8.2.[5] It defines appropriate official as the "office or official identified in the personal written notice." *Id*. Thus, the regulation effectively defines "filed" as when a claim is "actually received by the office or official identified in the personal written notice." *Id*.

In other words, the CFR looked at the two possible uses of the word "filed" that the Court discussed above (when it was placed in the mail or when it was received by the agency) and chose to define "filed" as when the agency first comes into possession of the claim. The CFR also determined who the "appropriate official" is in the statute: the office or official identified in the personal written notice. For example, here the notice required claims to be mailed to the Philadelphia branch of "the Federal Bureau of Investigation (FBI), Attn: Forfeiture Paralegal Specialist." Under the definition in the CFR, had Mr. Goodchild sent his claim to the Pittsburgh FBI mailroom, for example, it would not have been "filed."

The CFR reasonably rejected a definition of "filed" as the date the claim is mailed. In CAFRA, Congress used the term "mailed" but declined to use it here. *See* 18 U.S.C. § 983(a)(2)(B) ("A claim under subparagraph (A) may be filed not later than the deadline set forth in a personal notice letter (which deadline may be not earlier than 35 days after the date the letter is mailed)"). Such a use highlights Congress' understanding that it could have defined

---

[5] The regulation also explains that, "[f]or purposes of computing the start of the 90–day period set forth in 18 U.S.C. 983(a)(3), an administrative forfeiture claim is filed on the date when the claim is received by the designated appropriate official." 28 C.F.R. § 8.2. This language mimics the language cited above, and confirms that the start of the 90-day clock begins when the claim is received by the "office or official identified in the personal written notice." *Id*. In other words, the regulation tracks the usage in the statute and agrees that the 90-day clock on the Government begins at the moment the claim is filed by the claimant.

"filed" as "the date the claim is mailed" but chose not to. Given that the regulation chooses one of the two permissible interpretations of the word, and such a reading fits with the statute, the Court finds the CFR definition reasonable at *Chevron* step II.

### C. Application

Given that the CFR definition is reasonable, the Court must interpret that provision and apply it to the facts of this case. As outlined above, the Code of Federal Regulations (CFR) defines "filed" as when a claim is "received by the office or official identified in the personal written notice." 28 C.F.R. § 8.2. "Receive" means "to come into possession of or get from some outside source." *Receive*, Black's Law Dictionary (10th ed. 2014). "Possession" is the "the exercise of dominion over property." *Possession*, Black's Law Dictionary (10th ed. 2014). Therefore, the CFR effectively defines the statutory term "filed" as "when the office or official identified in the personal written notice first exercises dominion over the claim." Here, this happened when the common carrier delivered the claim to the agency.

Federal courts have consistently agreed with the interpretation that "receive" must delineate when something is first acquired by the recipient. *See*, *e.g.*, *Fridman v. NYCB Mortg. Co.*, 780 F.3d 773, 776 (7th Cir. 2015) (Wood, C.J.) (interpreting "date of receipt" as "the date that the payment instrument or other means of payment reaches the mortgage services"); *United States v. Stanley*, 896 F.2d 450, 451 (10th Cir. 1990) (interpreting the phrase "any person who knowingly receives" as meaning "to acquire control in the sense of physical dominion or apparent legal power to dispose of the" property); *In re Circuit City Stores, Inc.*, 432 B.R. 225, 230 (Bankr. E.D. Va. 2010) (interpreting "received" under the bankruptcy code as "taking physical possession").

Here, the only possible meaning of receive is when the claim is delivered to the physical agency address. That is when the Government first exercises dominion over the claim. Courts around the country have come to the same conclusion. *See United States v. $34,796.49, More or Less, in U.S. Currency*, No. 14-cv-0561, 2015 WL 1643582, at *5 (S.D. Ala. Apr. 13, 2015) ("[A] claim is 'filed' for § 983(a)(3)(A) purposes upon delivery to the designated agency at the address specified in the notice to interested parties, not when it is time-stamped as having reached the desk of a particular person or division of that agency."); *United States v. $229,850.00 in U.S. Currency*, 50 F. Supp. 3d 1171, 1178 (D. Ariz. 2014) ("A finding that the claim is filed when it is received by the mailroom of the agency where the claimant is directed to send the claim is consistent with the purpose of CAFRA."); *Beck v. United States*, No. 10-cv-2765, 2011 WL 862952, at *5 (D. Md. Mar. 10, 2011) (rejecting the Government's argument that "to be considered filed, a claim must come into the possession of a specific individual," noting that the "Court finds this argument seriously misplaced.").

Applying this plain reading of the regulation here, the Court finds that the claim arrived at the agency on May 4, so Mr. Goodchild filed his claim on May 4. This means that the Government's complaint is time-barred.

### 1. *Possession*

The Government argues that the CFR definition means that the clock does not start until it first comes into the official's possession, and that the official did not *physically* possess the claim until it was in his or her hands on May 5. This argument misconstrues possession. Possession need not be physical possession; implied and constructive possession are just as much legal possession.

Determining possession is a question that has vexed law students, lawyers and jurists, but the basic principles are well settled. Possession is either the exercise of (1) dominion and control or (2) the right to exclude others from the property. *Denny v. Schultz*, 708 F.3d 140, 148 (3d Cir. 2013) (Rendell, J., dissenting) ("It is axiomatic that constructive possession requires either the exercise of control or dominion, or the power and intention to exercise dominion or control, over property."); *Byrd v. United States*, 138 S. Ct. 1518, 1527 (2018) ("'One of the main rights attaching to property is the right to exclude others,' and, in the main, 'one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude.'") (quoting *Rakas v. Illinois*, 439 U.S. 128, 144 (1978)); *see also* 2 W. BLACKSTONE, COMMENTARIES at *2 ("[S]o it is agreed upon all hands, that occupancy gave also the original right to the permanent property in the substance of the earth itself; which excludes every one else but the owner from the use of it").

One possesses her car despite not being inside of it, because she exercises control over the keys to the car. One possesses the book sitting next to him, even though he is not physically holding the book. Similarly, here, both the FBI office and official possess the claim once the claim is delivered to the FBI office and correctly addressed to the proper recipient. At that point, the Government has dominion and control over the claim, with a right to exclude others from its use. Certainly, at that point, the *sender* does not have possession.

Moreover, the Government's interpretation is circular. It wants the ability to sit on the claim (and extend its window to file) while simultaneously claiming that it has not received the claim. Such an argument is inherently inconsistent. The Seventh Circuit of Appeals rejected this argument in the Truth in Lending Act (TILA) context. TILA requires mortgage servicers to

credit payments to consumer accounts on "the date of receipt" of payment. *See* 15 U.S.C. § 1639f(a). In interpreting this provision, that court held that the date of receipt was the day the check was deposited with the bank. *Fridman*, 780 F.3d at 775. The court rejected the servicer's argument that the "date of receipt" was the (later) date it was processed, explaining that "it is the servicer that decides how quickly to collect that payment through the banking system. . . . The servicer is in control of the timing, and without the directive to credit the payment instrument when it reaches the servicer, the servicer could decide to collect payment through a slower method in order to rack up late fees." *Id*. at 779. The court highlighted the fact that the ability to hold the check shows possession. To return to an earlier metaphor, the kneeling quarterback is able to run out the clock only because his team has wrested *possession* of the ball from the opponent.[6] Similarly, one cannot sit on a claim without having possession of it, and the Government's ability to run out the clock here highlights that it has possession of the claim. The Government cannot have it both ways: it cannot retain the ability to hold a claim in limbo, while simultaneously claiming it does not possess the claim.

In attempting to combat the Government's argument, Mr. Goodchild argues that the "office or official identified in the written notice" (as required by the regulation) was the FBI, as opposed to the Forfeiture Paralegal Specialist. The Court finds this distinction immaterial. For the purposes of exercising control over the claim, both the office and official have received the claim once it is in the FBI mailroom, much the way Mr. Goodchild "received" notice of the forfeiture once the claim was delivered to his mailbox, even if he only checks his mailbox once a week. For these reasons, the Government's complaint is time-barred.

---

[6] For example, in the Philadelphia Eagles historic 2018 Superbowl winning-season, the team ended its 38-7 drubbing of the Minnesota Vikings in the NFC Championship Game with possession of the ball. Confident with its ability to control the clock until time expired, the team kneeled three times to run out the clock.

15

## 2. Auer *Deference*

Because the Government is interpreting its own regulation here, the Government's view arguably requires an analysis of *Auer* deference. *Auer v. Robbins*, 519 U.S. 452, 462 (1997). Under *Auer*, the agency's interpretation of a regulation is "controlling unless plainly erroneous or inconsistent with the regulation." *Id*. at 461 (internal quotations omitted). That the interpretation comes "in the form of a legal brief [does not] make it unworthy of deference." *Id*. at 462. This presumption can be overcome by some "reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Id*. This can be determined in a variety of ways, such as when "the interpretation is nothing more than a 'convenient litigating position.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 154 (2012). The Government has submitted no evidence that this was a product of "the agency's fair and considered judgment on the matter in question," *Auer*, 519 U.S. at 462, nor has the Government asserted that its position in this case deserves *Auer* deference.

Therefore, the Court finds that the views of the Government are merely a convenient litigating position, rather than a reasoned determination by an agency interpreting its regulation. Even if *Auer* deference did apply, for the reasons outlined above, "receive" must denote a change in possession much the same way "filed" does, and the interpretation advanced by the Government here would therefore be unreasonable and outside the scope of the text of the statute.

## II. Equitable Tolling

The Government argues that, even if the Court finds that its interpretation is not adopted, the Government should be granted the benefit of equitable tolling. A party "is entitled to

equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 530 U.S. 631, 648 (2010) (internal quotations omitted).

The Court fails to see how the Government has met the two-part test above. Although the Government may have, at one time in the past, reasonably misinterpreted the law, the majority of the courts to address the issue have determined that the rule advocated for by the Government defies the statutory text. For that reason, the "settled state of the law at the relevant time belies any claim to legal confusion" and, therefore, the Court will "decline[] to equitably toll the limitations period." *Lawrence v. Florida*, 549 U.S. 327, 336 (2007). The Court's conclusion today cannot possibly take the Government by surprise.

The Government points to many courts around the country that have applied equitable tolling in just this circumstance, where the Government is a day or two late in filing its complaint under CAFRA. But that authority actually cuts against the Government's argument. In each of those cases, the Courts held that, even though the reading the Government proposed was incorrect, the Court would equitably toll the statute of limitations. *See*, *e.g.*, *United States v. Six Hundred Fourteen Thousand Three Hundred Thirty-Eight Dollars and no Cents ($614,338.00) in United States Currency*, 240 F. Supp. 3d 287 (D. Del. March 7, 2017) (finding that the Government had violated the 90-day deadline, but tolling statute of limitations); *United States v. $34,796.49, More or Less, in U.S. Currency*, No. 14-cv-0561, 2015 WL 1643582, at *5 (S.D. Al. April 13, 2015) (same); *$229,850.00 in U.S. Currency*, 50 F. Supp. 3d at 1179–85 (same); *Beck*, 2011 WL 862952, at *5 (same).

This mountain of precedent gave the Government ample notice of the meaning of the regulation. In short, the fact that the Government so frequently had to rely on equitable tolling shows how precarious the Government's legal position is. At a certain point, the Government cannot rely on equitable tolling to enact principles that contravene the statute and a plain reading of its own regulation.[7] Therefore, the Court declines to grant equitable tolling.

**CONCLUSION**

For the foregoing reasons, the motion to dismiss is granted. An appropriate order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[7] Moreover, although courts have leeway to extend obligations of claimants, forfeitures are generally disfavored, and the Government must strictly comply with its deadlines. *See United States v. 2014 Mercedes-Benz GL350BLT*, 162 F. Supp. 3d 1205, 1211 (M.D. Ala. 2016).